# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

No. 24-3124

---

FIRST CHOICE WOMEN'S RESOURCE CENTERS, INC.,
*Plaintiff-Appellant,*

v.

ATTORNEY GENERAL NEW JERSEY,
*Defendant-Appellee*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY (No. 23-cv-23076 (MAS))

---

## BRIEF OF DEFENDANT-APPELLEE

---

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

DAVID LEIT
*Assistant Attorney General*

NATHANIEL I. LEVY
MEGHAN K. MUSSO
LAUREN E. VAN DRIESEN
ELIZABETH R. WALSH
*Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(862) 350-5800
*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

COUNTERSTATEMENT OF JURISDICTION ......................................3

COUNTERSTATEMENT OF ISSUES .....................................................4

RELATED CASES AND PROCEEDINGS...............................................4

COUNTERSTATEMENT OF THE CASE.................................................4

    A. New Jersey Statutes.........................................................................4

    B. The Investigation and Subpoena. ..................................................6

    C. Procedural History........................................................................12

SUMMARY OF ARGUMENT ................................................................20

ARGUMENT .............................................................................................22

    I.   THE DISTRICT COURT CORRECTLY FOUND APPELLANT'S CLAIMS ARE NOT RIPE. ....................................................................22

    II.  APPELLANT IS UNLIKELY TO SUCCEED ON THE MERITS. ............31

    A. Appellant Is Not Likely To Succeed On Its Retaliation, Selective Enforcement, Or Viewpoint Discrimination Claims.................................31

    B. Appellant Is Not Likely To Succeed On Its Association Claim. ..............42

    III. THE EQUITIES FORECLOSE A PRELIMINARY INJUNCTION. ..........51

CONCLUSION ........................................................................................ 55

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)........................................................................24

*Abbott v. Perez*,
   585 U.S. 579 (2018)........................................................................54

*ADP, LLC v. Rafferty*,
   923 F.3d 113 (3d Cir. 2019)............................................................19

*Ams. for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021)........................................................ 21, 42, 43, 44

*Belle Fourche Pipeline Co. v. United States*,
   751 F.2d 332 (10th Cir. 1984) .................................................... 22, 23

*CBA Pharma, Inc. v. Perry*,
   2023 WL 129240 (6th Cir. Jan. 9, 2023) .................................... 29, 30

*Children's Health Def., Inc. v. Rutgers*,
   93 F.4th 66 (3d Cir. 2024). ...........................................................40

*Coinbase, Inc. v. Bielski*,
   599 U.S. 736 (2023)........................................................................53

*Del. State Sportsmen's Ass'n v. v. Del. Dep't of Safety & Homeland Sec.*,
   108 F.4th 194 (3d Cir. 2024) ...................................................... 51, 52

*DeMartini v. Town of Gulf Stream*,
   942 F.3d 1277 (11th Cir. 2019) ............................................. 32, 33, 35

*Exxon Mobil Corp. v. Schneiderman*,
   316 F. Supp. 3d 679 (S.D.N.Y. 2018) ......................................... 37, 38

*FTC v. Standard Oil Co. of Cal.*,
   449 U.S. 232 (1980).......................................................................53

*Gaspee Project v. Mederos*,
   13 F.4th 79 (1st Cir. 2021).......................................................... 43, 47

*Gen. Fin. Corp. v. FTC*,
    700 F.2d 366 (7th Cir. 1983) ........................................................ 22, 23

*Google v. Hood*,
    822 F.3d 212 (5th Cir. 2016) ............................................... 12, 13, 24

*Hartman v. Moore*,
    547 U.S. 250 (2006) ............................................................... 20, 31, 32

*Hill v. City of Scranton*,
    411 F.3d 118 (3d Cir. 2005) ................................................. 33, 36, 40

*Ill. ex rel. Madigan v. Telemarketing Assocs., Inc.*,
    538 U.S. 600 (2003) ...................................................................... 43, 44

*In re Addonizio*,
    248 A.2d 531 (N.J. 1968) ....................................................................5

*In re Diet Drugs*,
    282 F.3d 220 (3d Cir. 2002) .............................................................53

*In re First Choice Women's Res. Centers, Inc.*,
    144 S. Ct. 2552 (2024) ......................................................................13

*In re Ramirez*,
    905 F.2d 97 (5th Cir. 1990) .............................................................22

*Interstate Commerce Comm'n v. Gould*,
    629 F.2d 847 (3d Cir. 1980) .............................................................54

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013) ...............................................................51

*Laird v. Tatum*,
    408 U.S. 1 (1972) ..............................................................................28

*Lauren W. ex rel. Jean W. v. DeFlaminis*,
    480 F.3d 259 (3d Cir. 2007) .............................................................35

*McBeth v. Himes*,
    598 F.3d 708 (10th Cir. 2010) ..........................................................32

*Meadows v. Enyeart*,
627 F. App'x 496 (6th Cir. 2015) ........................................................32

*Mo. Pac. Ry. Co. v. Fitzgerald*,
160 U.S. 556 (1896) ............................................................................53

*Mobil Expl. & Producing U.S., Inc. v. Dep't of Interior*,
180 F.3d 1192 (10th Cir. 1999) ..........................................................22

*NAACP v. Ala. ex rel. Patterson*,
357 U.S. 449 (1958) ............................................................................47

*Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*,
80 F.4th 215 (3d Cir. 2023) ...............................................................28

*National Rifle Ass'n of America v. Vullo*,
602 U.S. 175 (2024), ................................................................... 41, 42

*Nieves v. Bartlett*,
587 U.S. 391 (2019) ...................................................................... 31, 36

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................54

*No on E v. Chiu*,
85 F.4th 493 (9th Cir. 2023) ...............................................................48

*Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*,
477 U.S. 619 (1986) ...................................................................... 31, 52

*Okla. Press Publ'g Co. v. Walling*,
327 U.S. 186 (1946) ............................................................................29

*Perry v. Schwarzenegger*,
591 F.3d 1147 (9th Cir. 2010) ............................................................45

*Platkin v. Smith & Wesson Sales Co., Inc.*,
289 A.3d 481 (N.J. Super. Ct. App. Div. 2023) .................................14

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017) ...............................................................51

*Reisman v. Caplin*,
    375 U.S. 440 (1964) ........................................................ 12, 22, 23, 24

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ...................................................................32

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ............................................................ 43, 44

*Schulz v. IRS*,
    413 F.3d 297 (2d Cir. 2005) ............................................... 22, 23

*Scott v. Tempelmeyer*,
    867 F.3d 1067 (8th Cir. 2017) ........................................... 32, 35

*Sczesny v. Murphy*,
    No. 22-2230, 2023 WL 4402426 (3d Cir. June 14, 2023) ..................................27

*Seattle Pac. Univ. v. Ferguson*,
    104 F.4th 50 (9th Cir. 2024) .............................................. 28, 30

*SEC v. McGoff*,
    647 F.2d 185 (D.C. Cir. 1981) ...................................................31

*SEC v. Wheeling-Pittsburgh Steel Corp.*,
    648 F.2d 118 (3d Cir. 1981) .....................................................39

*Second Amendment Found. v. Ferguson*,
    2024 WL 97349 (W.D. Wash. Jan. 9, 2024) ............................. 29, 30

*Shea v. Off. of Thrift Supervision*,
    934 F.2d 41 (3d Cir. 1991) ................................................. 22, 24

*Stradford v. Sec'y Pa. Dep't of Corr.*,
    53 F.4th 67 (3d Cir. 2022) ......................................................40

*Tafflin v. Levitt*,
    493 U.S. 455 (1990) ...............................................................53

*Twitter v. Paxton*,
    56 F.4th 1170 (9th Cir. 2022) .................................................28

*U.S. News & World Reports v. Chiu*,
  2024 WL 2031635 (N.D. Cal. May 7, 2024) ......................................................29

*UMDNJ v. Corrigan*,
  347 F.3d 57 (3d Cir. 2003).......................................................... 28, 33

*Wearly v. FTC*,
  616 F.2d 662 (3d Cir. 1980)................................................................23

**Statutes**

28 U.S.C. § 1291 ...............................................................................3

Miss. Code Ann. § 75-24-17 ...............................................................25

N.J. Stat. Ann. § 45:1-18................................................... 4, 29, 54

N.J. Stat. Ann. § 45:1-18.1................................................................48

N.J. Stat. Ann. § 45:1-18.2 ...............................................................5

N.J. Stat. Ann. § 45:1-19................................................... 25, 27

N.J. Stat. Ann. § 45:1-21 ...............................................................5

N.J. Stat. Ann. § 45:17A-32 ...............................................................5

N.J. Stat. Ann. § 45:17A-33 ................................................. *passim*

N.J. Stat. Ann. § 56:8-2...............................................................4

N.J. Stat. Ann. § 56:8-3...............................................................4, 29

N.J. Stat. Ann. § 56:8-6................................................... 25, 27, 54

N.J. Stat. Ann. §§ 10:7-1 to -2 ...............................................................39

**Regulations**

N.J. Admin. Code § 13:35-6.10 ...............................................................6

**Other Authorities**

*Facts Are Important: Medication Abortion "Reversal" Is Not Supported by Science*, Am. Coll. of Obstetricians & Gynecologists, https://tinyurl.com/mrye7fsa ........................................................................8, 50

Jenifer McKenna & Tara Murtha, *Designed to Deceive: A Study of the Crisis Pregnancy Ctr. Industry in Nine States* (2021) .................................................50

N.J. Dep't of Health, Hospitals, Ambulatory Care, and other Acute Care Facilities, https://tinyurl.com/yaye3a7n ..........................41

Open Letter from Attorneys General Regarding CPC Misinformation and Harm, Calif. Off. of the Att'y Gen. (Oct. 23, 2023), http://bit.ly/3CtAShf ........39

Planned Parenthood Notice of Health Information Privacy Practice, https://tinyurl.com/3mrx6a9s (last visited Dec. 2, 2024). ...................................41

U.S. Food & Drug Admin., Mifeprex (Mifepristone) Prescribing Information (Mar. 2016) ...................................................................8

# **INTRODUCTION**

The New Jersey Attorney General and Division of Consumer Affairs initiated an investigation into Appellant First Choice Women's Resource Centers, Inc. based upon concerns that it may be misleading donors and potential clients regarding the character and scope of its services. Because the Division's preliminary investigative steps—including a review of Appellant's publicly-available websites, which make divergent representations as to its mission and operations depending on the target audience of the website—furthered concerns that Appellant may be violating the state consumer-fraud, charities, and professional licensing laws, the State issued a Subpoena on November 15, 2023. The Subpoena is not self-executing; it can only be enforced by a New Jersey state court. But before even lodging objections in state court, Appellant filed this collateral attack in federal court, arguing that the mere issuance of the Subpoena violated its federal constitutional rights.

The district court correctly dismissed the federal court action twice over, each time concluding that Appellant's federal claims were unripe. As the court explained, and as decisions of the Supreme Court and other circuits confirm, Appellant faced no imminent injury from the mere issuance of the non-self-executing Subpoena. The rule is clear: when the sole statutory authority to compel compliance with a subpoena rests with a state court, a collateral federal suit challenging the subpoena alone is premature—because any harm to that plaintiff depends on future decisions by the

state court of whether to order enforcement. That is especially clear when the subpoena recipient faces no sanctions for failing to comply at that time. That describes this case perfectly: Appellant brought this suit before the state court had taken *any* action with respect to the Subpoena. And although the state court subsequently rejected Appellant's motion to quash the Subpoena, it has expressly not yet decided whether to order compliance, and has promised to review these federal constitutional issues first. As a result, Appellant's federal challenge remains unripe as the state court continues to evaluate the very claims it lodges in this appeal—at least as of the time the State finalized this brief for filing.[1]

In any event, even if Appellant could clear that jurisdictional defect, it is not entitled to a preliminary injunction. Initially, it will not succeed on the merits of its First Amendment claims. Appellant's retaliation and selective-enforcement claims fail because it has not even tried to show that the State lacked legitimate grounds for issuing the Subpoena. Moreover, the Attorney General's statements expressing concern that certain nonprofit entities may be misleading the public about reproductive care hardly show that this Subpoena was premised on an improper motive—if anything, it demonstrates good-faith concerns about violations of state

---

[1] Given this brief's deadline is the same day that the state trial court must issue its next decision in this case, the State will submit a Fed. R. App. P. 28(j) letter to update this Court as to that decision and welcomes the opportunity to submit supplemental briefing on the impact of that decision.

law. And Appellant's associational claims also fall short. The State has good reason to think some of Appellant's donors may have been misled about Appellant's mission and operations from two of its websites, and sought information so the Division can speak with a representative sample to assess whether they were misled. The State has a well-established interest in combatting misleading charitable solicitations, and a targeted subpoena is precisely the kind of approach it may use to serve that end—especially when the Division has no alternative, other than accepting Appellant's say-so, to ensure Appellant's donors were not misled.

Finally, Appellant cannot establish that the equities favor preliminary relief. Because the state court has not yet compelled Appellant to produce documents, Appellant suffers no threat of irreparable harm. And even if the state court does order production, a loss from a state tribunal after due consideration of one's claims is not irreparable harm either. Finally, the balance of the equities favors the State, which would be unable to investigate and root out fraud and misconduct if an injunction were to forestall its efforts well into 2025—over a year after the Subpoena issued in November 2023. Such a result would harm the public interest and would incentivize future subpoena recipients to avoid compliance and stymie subpoena enforcement.

## COUNTERSTATEMENT OF JURISDICTION

For the reasons set forth below, this Court lacks Article III jurisdiction. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF ISSUES

I.      Whether the district court correctly held that Appellant's constitutional challenges to a non-self-executing subpoena are unripe because the state court has not compelled compliance.

II.     Whether, even if Appellant's claims are ripe, Appellant has failed to establish a likelihood of success on its constitutional theories.

III.    Whether Appellant has demonstrated irreparable harm or shown that the remaining equities weigh in favor of a preliminary injunction.

## RELATED CASES AND PROCEEDINGS

The State adopts the list of related cases from Appellant's brief. FC.Br.6–7.

## COUNTERSTATEMENT OF THE CASE

### A. New Jersey Statutes.

The New Jersey Consumer Fraud Act ("CFA"), the Charitable Registration and Investigations Act ("CRIA"), and the Professions and Occupations law ("P&O Law") empower the Attorney General and Division of Consumer Affairs to investigate whether an entity is engaged in certain specified unlawful practices. *See* N.J. Stat. Ann. § 56:8-3 (CFA); § 45:17A-33(c) (CRIA); § 45:1-18 (P&O Law). The statutes and regulations define the covered practices, which include deceptive and fraudulent commercial practices, N.J. Stat. Ann. § 56:8-2 (CFA), deceptive and misleading statements or omissions by charitable organizations, N.J. Stat. Ann.

4

§ 45:17A-32(a), -(c)(3), -(c)(7) (CRIA), and the unlicensed practice of medicine, deceptive and misleading practices, and other professional misconduct, N.J. Stat. Ann. § 45:1-18.2, -21 (P&O Law). The Attorney General and Division are "charged with seeing that" these statutes are "obeyed" and empowered to "inquire to be assured of compliance." *In re Addonizio*, 248 A.2d 531, 542 (N.J. 1968).

The CRIA addresses deceptive and misleading statements or omissions made by charitable organizations that relate to "the planning, conduct, or execution of any solicitation or charitable sales promotion," including applicable violations of the CFA and the use of "information, statements or communications that, although literally true, are presented in a manner that has the capacity to mislead the average consumer." N.J. Stat. Ann. § 45:17A-32(c)(3), (7); *see also id.* § 45:17A-32(a) (referring to misleading statements made "on behalf of a charitable organization by persons including, but not limited to commercial co-venturers, fund raising counsels, independent paid fund raisers or solicitors").

The P&O Law bars the unlicensed practice of medicine. N.J. Stat. Ann. § 45:1-18.2. Other provisions and regulations prohibit licensed medical professionals from engaging in deceptive and misleading practices and other forms of professional misconduct. *See*, *e.g.*, N.J. Stat. Ann. § 45:1-21 (prohibiting professional licensees from using "dishonesty, fraud, deception, misrepresentation, false promise or false pretense," engage in "professional or occupational misconduct," or "permit[ing] an

unlicensed person" to engage in the unlicensed practice of medicine); N.J. Admin. Code § 13:35-6.10(c) (prohibiting medical advertising that uses a "misrepresentation of a material fact" and any "suppression, omission or concealment of any material fact" that the professional "knows or should know" would "prohibit[] a prospective patient from making a full and informed judgment on the basis of the information set forth in the advertisement").

### B. The Investigation and Subpoena.

This case arose from the Division's work to investigate whether Appellant's conduct violated state laws—in particular, whether Appellant misled its donors and potential clients, among others, into believing Appellant provides comprehensive reproductive health care services, including abortion care and contraception, when it in fact aims to deter individuals from seeking such services. Early investigatory steps, including a review of the different websites Appellant maintains for different audiences, revealed that Appellant may be violating state law. The core website Appellant maintains for donors, https://1stchoicefriends.org, says that Appellant has a pro-life mission to "protect the unborn," JA857–58, including on its donation-solicitation and volunteer application pages, *see* JA852–58. Its donation page states, "pro-life donors like you have saved lives and served women considering abortion in New Jersey." JA857. And the site's Volunteer Application likewise confirms that Appellant is "committed to assisting women to carry to term." JA853.

But Appellant maintains other websites, namely https://1stchoice.org (which it describes as its "Client Site") and https://firstchoicewomancenter.com, that omit references to its mission, even though these websites also have donation pages. JA698-701. For example, one passage on the Client Site states:

> You may be considering abortion as an option. Before you decide, it is important to remember that abortion is a medical procedure and, like any other medical procedure, you should consult a medical professional beforehand. We are a network of clinics providing the best care and most up-to-date information on your pregnancy and pregnancy options and have multiple locations to serve you. We are dedicated to providing you with everything you need to make an informed decision about abortion, at no cost to you.... It is important to determine the viability of your pregnancy before paying a high cost for an abortion.

JA912; *see also, e.g.*, JA747 ("the Right to Choose Includes the Right to Know."). Although these sites contain a disclaimer that "First Choice Women's Resource Centers is an abortion clinic alternative that does not perform or refer for termination services," JA681, this fine print appears on the bottom of the webpage and does not disclose First Choice's mission as a pro-life ministry and does not appear on the Client Site's donation page, *see* JA JA698-701. Moreover, the donors who give via https://1stchoice.org and https://firstchoicewomancenter.com are told that Appellant invites those women "considering an abortion" to "[l]earn more about the abortion pill, abortion procedures, and your options in New Jersey." JA676. But they are not told about the pro-life work in which Appellant engages. *See id.*; *see also, e.g.*,

JA856 (Appellant instructing volunteers not to wear "pro-life jewelry or buttons" when engaging with clients).

Based on its review of publicly available information, the State also became concerned that Appellant is making medical statements that may be misleading or untrue. *Compare* JA926 (stating that "a pre-abortion ultrasound is generally required before you take the abortion pill"), *with* U.S. Food & Drug Admin., Mifeprex (Mifepristone) Prescribing Information 17 (Mar. 2016), [https://tinyurl.com/2vndx5k3](https://tinyurl.com/2vndx5k3) (noting ultrasound is an option, but not indicating this is generally required). Appellant also claims that "[t]here is an effective process for reversing the abortion pill," JA760, despite a lack of credible scientific evidence supporting that factual claim, *see*, *e.g.*, *Facts Are Important: Medication Abortion "Reversal" Is Not Supported by Science*, Am. Coll. of Obstetricians & Gynecologists, [https://tinyurl.com/mrye7fsa](https://tinyurl.com/mrye7fsa) (last visited Dec. 1, 2024). The Division's review of Appellant's public-facing materials identified other concerning factual claims. *See, e.g.*, JA751, 755 (claiming that "[b]ecause of the risk of serious complications, the abortion pill is only available through a restricted program," and that the pill can lead to "sepsis" and "rupturing of the uterus").

The State also identified concerns about the role (or lack thereof) of licensed professionals in Appellant's operations. For one, it identified serious questions as to whether certain individuals working for Appellant perform diagnostic sonograms

and even purport to assess gestational age, viability, and ectopic pregnancies without possessing the requisite qualifications and licensure. *Compare* JA673 (representing Appellant's services are overseen by a physician), *and* JA903 (purporting to diagnose ectopic pregnancies and determine fetal viability), *with* JA731, 734 (website stating that it is "not an obstetrical medical practice" and "does not use ultrasound to ... diagnose abnormalities"). For another, the State's review of Appellant's materials, and its own undercover phone calls to Appellant, raised concerns as to whether Appellant's personnel who provide medical services are properly licensed, and whether licensed personnel comply with applicable standards of care when providing services like ultrasounds or informing clients regarding the risks of abortions. *See* JA747, 892 (Client Site inviting potential clients to contact them to consult with "a licensed medical professional," and adding that Appellant's "medical staff can answer all of [clients'] questions … with professional accuracy); JA676, 741, 754, 756 (images on websites of medical staff, including individuals wearing scrubs and stethoscopes); JA673 (Appellant representing to undercover investigator that doctors oversee medical services, but are not necessarily onsite; confirming that staff conduct ultrasounds; and indicating staff will not provide information about the risks of abortion absent an agreement to submit to a pregnancy test).

The investigation also revealed concerns about Appellant's patient-privacy practices. Appellant represents to clients that its services are "confidential" and "private." JA682, 730, 736, 749. But elsewhere, Appellant claims that it is exempt from HIPAA, *see* JA952, and its privacy policy indicates that it shares information with affiliates, *see* JA704. That raised concerns about how and whether Appellant keeps health or other sensitive information private and secure.

To determine whether Appellant violated state law, the State issued the instant Subpoena on November 15, 2023. *See* JA122–145. Consistent with other subpoenas issued by the State in investigating a wide variety of entities, the Subpoena's 28 requests seek documents that will enable the State to evaluate whether Appellant has violated the relevant portions of the P&O Law, CRIA, and/or CFA, as follows:

| Requests 1-2 | The methods and contents of solicitations and advertisements by Appellant |
|---|---|
| Requests 3-5, 13-19, 21, 27 | The services Appellant provides to clients, including documents and videos shown to clients, confidentiality and privacy policies, the ultrasound imaging technology utilized and personnel who provide ultrasound services, licensure requirements for such services, professional licensees that provide services to clients, personnel training procedures, and policies, referrals, and compliance policies and procedures |
| Requests 6-9 | Documents substantiating specific medical and scientific claims made on Appellant's websites |
| Request 10 | Development of Appellant's websites |
| Request 11 | Complaints or concerns from clients or donors and Appellant's processes for handling same |

| Request 12 | Legal or administrative proceedings related to Appellant's services, advertisements, solicitations, and medical claims |
|---|---|
| Requests 20, 26 | Donations to Appellant other than through the Donor Solicitation Page, and how personnel are instructed and in fact communicate with donors regarding Appellant's charitable purpose |
| Request 22, 23 | Appellant's affiliation with Care Net and Heartbeat International, Inc. |
| Request 24, 25 | Appellant's organizational structure and tax-exempt status |
| Request 28 | Appellant's document retention policies |

*See* JA122–145. All but two requests seek information for the 3 years prior to the Subpoena's issuance. JA127. And Requests 6 and 7 only seek 10 years' worth of documents substantiating medical claims to ensure Appellant can present all relevant support. JA133–34. Further, just one request (Request 26) implicates disclosure of donor information, targeted at donors who may not have been aware of Appellant's pro-life mission. JA137 (seeking documents "sufficient to Identify donations made to [Appellant] by any means other than through the Donor Solicitation Page"). As the State has since clarified, this request is focused on (1) the *donors* who made contributions through the Client Pages, where the State already has cause to believe they may have been misled by the webpages they reviewed, and (2) information identifying the *methods* of donations other than the Donor Solicitation and Client Pages, so that the State can further investigate what other information these donors had. JA632–633.

The Subpoena set December 15, 2023, as the deadline for response. JA123. Rather than respond, Appellant filed this suit in federal district court two days before the deadline. JA056–90.

**C. Procedural History.**

Appellant's challenges to the Subpoena have spawned litigation before the New Jersey Superior Court, the Appellate Division, the federal district court, this Court, and the U.S. Supreme Court. A brief summary of the relevant proceedings follows.

1.      Federal Action: District Court Dismissal And Initial Appeal.

On January 12, 2024, the federal district court dismissed this lawsuit, finding Appellant's claims unripe. JA192–202. The district court reasoned that the State lacked power to enforce the Subpoena because state law places exclusive authority to enforce or quash an investigatory subpoena with the New Jersey Superior Court. JA195–96 (citing N.J. Stat. Ann. §§ 56:8-6; 45:17A-33(g)). As a result, the court held, because it "cannot yet know whether the state court … will, in fact, enforce the Subpoena in its current form, this matter is not ripe for resolution because no actual or imminent injury has occurred." JA200.

The district court cited significant precedential support for its ripeness ruling. In particular, it emphasized the "factually identical" *Google v. Hood*, 822 F.3d 212, 225 (5th Cir. 2016), which found a federal constitutional challenge to a non-self-

executing state investigatory subpoena was unripe because the recipient had not "be[en] forced to comply with the subpoenas nor subjected to any penalties for noncompliance." JA198. This had long been the rule for review of non-self-executing federal subpoenas, JA197 (citing *Reisman v. Caplin*, 375 U.S. 440, 443–46 (1964)), and *Google* and the district court were "skeptical that a state administrative subpoena can be ripe for federal court adjudication where a similar federal administrative subpoena would not be." JA198–99 (explaining that principles of "comity should make [federal courts] less willing to intervene when there is no *current* consequence for resisting the subpoena and the same challenges raised in the federal suit could be litigated in state court." (quoting *Google*, 822 F.3d at 226)).

Appellant appealed. This Court denied an injunction pending appeal on February 15, 2024. CA3.Dkt.20.[2] It also denied Appellant's request for an expedited appeal, noting Appellant did not "promptly file a motion to expedite" and had failed to tell the Court that it was "simultaneously pursuing extraordinary relief from the Supreme Court and representing to that Court that expedited treatment is not necessary." CA3.Dkt.29 (reminding Appellant of the duty of candor). The Supreme Court denied Appellant's petition for a writ of mandamus to require the district court

---

[2] This brief cites the prior appeal in this matter, CA3 No. 24-1111, as "CA3.Dkt.," and the docket in this appeal, CA3 No. 24-3124 as "Dkt."

to exercise jurisdiction, without noted dissent. *See In re First Choice Women's Res. Centers, Inc.*, 144 S. Ct. 2552 (2024).

2.     State Action: Superior Court Denies Appellant's Motion To Quash.

Meanwhile, the State moved to enforce the Subpoena in New Jersey Superior Court on January 30, 2024—ten months ago. JA983. Appellant cross-moved to stay or quash the Subpoena on April 1, 2024, *id.*, and the parties briefed the same constitutional arguments Appellant raised in its federal action, *see id.*; *see* SA45–67, SA500–10. On May 28, the state trial court granted the State's application, denied the cross-motion to quash, and denied Appellant's motion for a stay pending appeal. JA260, 267–68. The court memorialized its rulings in orders dated May 30 (denying stay pending appeal), June 6 (denying cross-motion to stay or quash), and June 18 (granting motion to enforce) ("June 18 Order"). JA989–992, JA247–49.

The state trial court's ruling found no "basis to deny the [State's] order to show cause and quash the subpoena." JA255–60. The court rejected Appellant's view that the Subpoena resulted from "retaliation and bias on the State's part," finding Appellant's claim to be "speculation." JA257. The court rejected Appellant's argument that the Attorney General's positions on reproductive healthcare supported its First Amendment claim that the Subpoena reflected improper animus, holding that "public officials, including the Attorney General, frequently make statements of public concern" but can still investigate entities that operate in those relevant

14

industries if the State has sufficient cause to do so. JA257 (quoting *Platkin v. Smith & Wesson Sales Co., Inc.*, 289 A.3d 481, 487 (N.J. Super. Ct. App. Div. 2023)).

But the state trial court did not address all the constitutional claims. It recognized that Appellant had certain arguments that did not challenge the entire Subpoena on its face, but "which center on" the Subpoena's "scope"—including Appellant's claims that certain of the requests would violate its First Amendment associational rights and that others were burdensome or unreasonable. JA257–58. But, the court emphasized, Appellant had never met with the State to discuss such issues. *Id.* So although the state court stated that "the Attorney General has not, at this very preliminary juncture of this matter, violated any statutory or constitutional tenets which would lead to a quashing of the subpoena at issue," JA260, the court concluded that Appellant's "constitutional arguments [we]re … premature" at that time, JA258. The state court's June 18 Order thus directed Appellant to "respond fully" to the Subpoena by July 18. JA248–49.

3.    Subsequent State Court Motions and Appellate Filings.

In the two months between the May 28 ruling and July 18 deadline, Appellant did not seek a stay or any other relief from the New Jersey Appellate Division. *See* JA985–86. Instead, on July 18, the deadline for compliance with the state trial court's June 18 Order, Appellant filed a motion for a protective order ("PO Motion") with the state trial court. JA986. Appellant also identified a list of specific Subpoena

requests to which it objected. Appellant then filed a notice of appeal, but again did not move for a stay. *Id*.

On July 26, the State opposed Appellant's motion and cross-moved to enforce litigants' rights ("Motion to Enforce June 18 Order") based on Appellant's failure to comply with the court order. JA463–65. On September 20, the state court held a hearing and found that it lacked jurisdiction to hear Appellant's PO Motion given the pending appeal to the Appellate Division, which divested the state trial court of the authority to review it. SA517–18. Despite acknowledging that it had jurisdiction to hear the State's pending enforcement motion despite the pending appeal, the state court held that motion in abeyance. SA518–22. The Appellate Division then granted a remand to allow the trial court to consider these motions by December 2. JA575.

4.      Subsequent Federal Filings And Decisions.

After the May 28 state-court ruling, Appellant waited 18 days to file a motion for an injunction pending appeal in its prior appeal before this Court. CA3.Dkt.49, 49-1. The State moved to dismiss that appeal as moot in light of the state court's June 18 Order—which the State believed required Appellant to "respond fully" by producing all requested documents by July 18. CA3.Dkt.50. On July 9, consistent with the State's request, this Court dismissed the prior appeal as moot and remanded

the case to district court. CA3.Dkt.56-1. 10 days later, Appellant filed another TRO/PI motion in the district court. DNJ.Dkt.41.

On November 12, the district court denied Appellant's TRO/PI motion and dismissed its claims without prejudice. *See* JA045–46. It found the state court had not yet compelled compliance with the Subpoena. Instead, Judge Shipp found that while the state court had required Appellant to provide *responses* to the Subpoena, including objections, it "remain[ed] an open question" whether Appellant would be compelled to disclose the materials it believed were constitutionally protected, and the state trial court had not yet decided whether to order such production. JA025. Because the recipient of a non-self-executing Subpoena faces no sanctions until the *court* decides that it must comply, the district court again held that the matter remained unripe under Article III. *Id.* The district court later also denied a Fed. R. App. P. 8 motion for injunction pending appeal. DNJ.Dkt.70.

Appellant appealed, and this Court granted Appellant's motion to expedite this appeal, setting oral argument for December 10. On November 15, Appellant moved for an injunction pending appeal before this Court.

5.      The State Court's November 19 Oral Argument.

On November 19, 2024, the state trial court heard argument on the State's Motion to Enforce and Appellant's PO Motion. Although Appellant's opening brief

provides little information about that hearing, the state court provided significant clarity regarding the scope and impact of its prior orders.

Initially, the court clarified the meaning of its June 18 Order, which directed Appellant to "respond fully" to the November 15, 2023 Subpoena. The State and its counsel had read the June 18 Order to require Appellant to produce the subpoenaed documents—indeed, that was why the State believed the June 18 Order had ripened the dispute in federal court. *See* JA663–64. Appellant, by contrast, believed that "respond fully" meant it simply had to provide some response that could be nothing more than an objection, including an objection based on its alleged constitutional rights or on some asserted privilege. *See* JA628 (Appellant arguing it "did comply with the order" because the "response can well be that we object"). The state court ultimately agreed with Appellant that its June 18 Order to "respond fully" meant only that Appellant could "object" to requests based on "constitutional claims" or "privileges." JA628; *see* JA663 (adding its "thought process" and "intention" in ordering Appellant to "fully comply" was only to solicit Appellant's responses and objections and then to adjudicate them). The court emphasized it was "not faulting the State" for its reading, acknowledging the requirement to "fully comply" was "not as clear as I should've made it" and emphasizing it would not "hold" this "against the State." JA663. But the court did conclude that it had not yet required Appellant to make any productions pursuant to the Subpoena. JA663–64.

The court also explained that it would not require production pursuant to the challenged subpoena requests until it further reviews the associational claims—the precise claims Appellant raises here. *See* JA625, JA637. And the state court categorically stated that it would not be issuing any sanctions for Appellant's nonproduction to date. *See* JA659 ("I'm not granting sanctions on this motion."). The court reserved decision on all other matters. *See* JA666.

In light of the state court's statements at the November 19, 2024 hearing, the State ultimately opposed Appellant's motion for an injunction pending appeal in this Court on the basis that the dispute was in fact still unripe. *See* Dkt.20. That remains the case as of the morning of December 2, when the State finalized this brief.

## STANDARD OF REVIEW

This Court "review[s] the District Court's denial of a preliminary injunction for abuse of discretion and any underlying legal questions de novo." *ADP, LLC v. Rafferty*, 923 F.3d 113, 119–20 (3d Cir. 2019). The movant must first "demonstrate a reasonable likelihood of success and that it would likely suffer irreparable harm absent an injunction." *Id.* If both are satisfied, "the court balances these factors, along with the relative hardship that the grant or denial of an injunction would inflict on the parties and the public interest." *Id.* at 120.

## SUMMARY OF ARGUMENT

I.     The district court correctly concluded that Appellant's claims are not ripe. Well-settled precedent establishes that a collateral challenge to a non-self-executing administrative subpoena is unripe unless and until a court with authority to enforce it compels production under threat of sanctions. Until then, the recipient has no obligation to comply with the subpoena and suffers no Article III injury. That principle fits this case perfectly: the state court has not yet compelled compliance with the Subpoena, and in fact has now confirmed Appellant faces no sanctions for non-production.

Appellant's counterarguments are unavailing. This Court never previously held the lawsuit was ripe, but instead dismissed the appeal as moot based on the parties' agreement that the case was ripe—a position based on an understanding of the state-court's June 18 Order that the state court has since disclaimed. Appellant also identifies no cognizable harm from merely litigating its claims before the state court. And Appellant presents neither evidence nor precedent establishing that the mere issuance of the Subpoena results in chill sufficient to establish injury-in-fact.

II.     Even if this Court finds this suit is justiciable, Appellant is unlikely to succeed on the merits.

A.     The First Amendment retaliation and selective enforcement/viewpoint discrimination claims are not likely to succeed. For one, Appellant cannot prove that

the State lacked sufficient cause for the Subpoena—a dispositive requirement. *See Hartman v. Moore*, 547 U.S. 250 (2006). The State had ample cause to investigate, including inconsistent and potentially misleading representations Appellant made to clients and donors across its websites, its potentially misleading or untrue medical statements, and concerns about potentially unlicensed professional practice.

Moreover, Appellant cannot show the Subpoena was driven by improper motive. The Attorney General's public statements and meetings on reproductive healthcare are not evidence of improper targeting but rather of legitimate concern about fraud. Appellant's reference to Planned Parenthood are inapt, as the two organizations are not similarly situated in any relevant respects. Significantly, Appellant makes divergent representations regarding its mission and operation across separate websites, which sets it apart from other organizations it claims warrant the same subpoena.

B.  Appellant fares no better on its associational claims. Combating donor fraud is a undisputedly a compelling state interest. This Subpoena is narrowly tailored to that interest; a subpoena is a prime example of an appropriately-targeted way to investigate fraud. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 613–14 (2021) (*AFP*). And the State's Requests regarding medical employees and affiliate organizations are similarly tailored to identify whether the professionals are complying with the state licensure rules.

III.    Nor can Appellant satisfy the remaining preliminary-injunction factors. To begin, Appellant cannot demonstrate irreparable harm. As the state trial court recently confirmed, it has not compelled compliance with the Subpoena. Moreover, Appellant's claim of irreparable harm is undercut by its lack of alacrity in seeking relief in both state and federal fora. Further, neither document production nor being required by a state court to comply with a state law subpoena before federal-court review would work an irreparable harm. By contrast, the State would be harmed if it cannot investigate potential fraud and professional misconduct. And any injunction would incentivize other subpoena recipients to collaterally attack state subpoenas, further compounding harm to the public's interest.

## **ARGUMENT**

This Court should affirm the district court's denial of a preliminary injunction for three reasons. First, the federal lawsuit is currently unripe. Second, even if this lawsuit were ripe, Appellant's First Amendment claims are unlikely to succeed on the merits. Finally, the equities likewise compel denial of preliminary relief.

## I.    THE DISTRICT COURT CORRECTLY FOUND APPELLANT'S CLAIMS ARE NOT RIPE.

The district court properly held that Appellant's claims in federal court are not yet ripe. Precedent instructs that a collateral challenge to a non-self-executing administrative subpoena is unripe unless and until the sole court with authority to

order  compliance actually does so. The state trial court—tasked by New Jersey law with enforcing the Subpoena—has confirmed that it has not yet done so.

1. A challenge to a non-self-executing administrative subpoena is unripe unless and until a court with authority to enforce it actually compels production. *See Reisman*, 375 U.S. at 448–50; *Schulz v. IRS*, 413 F.3d 297, 303 (2d Cir. 2005); *Mobil Expl. & Producing U.S., Inc. v. Dep't of Interior*, 180 F.3d 1192, 1203 (10th Cir. 1999); *In re Ramirez*, 905 F.2d 97, 98–100 (5th Cir. 1990); *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334–35 (10th Cir. 1984); *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 371 (7th Cir. 1983). This Court's decisions are in accord. *See Shea v. Off. of Thrift Supervision*, 934 F.2d 41, 45–46 (3d Cir. 1991) ("The subpoenaed party faces actual harm only after a successful enforcement action has been brought and ... has been ordered to comply. It is at that time, and not before, that the party may have an order reviewed by this court."); *Wearly v. FTC*, 616 F.2d 662, 667–68 (3d Cir. 1980) (finding challenge to agency subpoena unripe because plaintiff "was free to await enforcement proceedings").

*Reisman* is instructive. There, the Supreme Court held that the recipient of an IRS summons could not obtain an injunction before a court enforced the summons. 375 U.S. at 443–46. Because the recipient would have a "full opportunity for judicial review before any coercive sanctions may be imposed," the recipient "would suffer no injury while testing the summons," and the Court therefore dismissed the suit "for

want of equity." *Id.* at 443, 449–50. For decades, courts—including this one—have uniformly applied *Reisman* to find that collateral challenges to non-self-executing subpoenas are unripe unless and until a court requires compliance. *See Wearly*, 616 F.2d at 667–68; *Schulz*, 413 F.3d at 300; *Belle Fourche Pipeline*, 751 F.2d at 334–35; *Gen. Fin. Corp.*, 700 F.2d at 371.

As this Court and others have recognized, that rule follows from blackletter ripeness principles. *See, e.g.*, *Wearly*, 616 F.2d at 667. As *Abbott Laboratories v. Gardner* explained, the ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until" the "effects" of an agency action are "felt in a concrete way by the challenging parties." 387 U.S. 136, 148–49 (1967). Only when an administrative action "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties," has the federal plaintiff suffered a "hardship" to render the pre-enforcement challenge ripe for judicial review. *Id.* at 149, 153. The *Reisman* line of cases confirms that those principles apply to non-self-executing subpoenas. Unlike other actions that immediately attach constitutional injury, the mere issuance of a subpoena attaches "no injury" on the recipient until a court compels compliance with the subpoena and threatens sanctions, *Reisman*, 375 U.S.

at 447–50. Until then, the recipient suffers no hardship from having to first litigate its challenges in the designated forum. *See id*.; *see also Shea*, 934 F.2d 45–46.

These ripeness principles apply to state agency subpoenas. For example, in *Google*, the Fifth Circuit relied on *Reisman* and its progeny to find unripe a challenge to a state-law subpoena analogous to the ones at issue here. *See* 822 F.3d at 225–26. As *Google* explained, because the Mississippi statute in *Google* provided that the Attorney General could only enforce his subpoenas by "'apply[ing]' to certain state courts" for "'an order' granting injunctive or other relief," any challenge to his subpoena remained unripe until such an order issued. *Id.* at 225. And because Google could not be "forced to comply" or face sanctions "absent a court order," it "would 'suffer no undue hardship from denial of judicial relief.'" *Id*. New Jersey law similarly requires the Attorney General to apply to a state trial court for an order enforcing the subpoena, and that court has discretion on whether to grant relief. *Compare* Miss. Code Ann. § 75-24-17, *with* N.J. Stat. Ann. § 56:8-6 (CFA); § 45:17A- 33(g) (CRIA); § 45:1-19 (P&O Law).

In the instant case, the state court has not yet compelled compliance with the non-self-executing Subpoena, and Appellant faces no threat of sanctions, making this dispute unripe. *See* JA666. While the state trial court previously issued an order on June 18 requiring Appellant to "respond fully" to the Subpoena, the court has since clarified at the November 19 hearing that its June 18 Order did not actually

compel Appellant to produce documents. Instead, the court explained that "respond fully" meant only that Appellant could still "object" to requests based on "constitutional claims" or "privileges." *See supra* at 17–18; JA625, 663. And the court confirmed Appellant faces no risk of sanctions at this time. *See* JA659. When the State finalized this brief on December 2, the state court has not decided whether to compel compliance, *see supra* at 18, making this federal case still unripe.

To be clear, this was not the State's position before the federal district court because the State had previously understood the state court's June 18 Order differently. But contrary to Appellant's refrain that the State has impermissibly shifted positions, the State's legal argument has not changed. Instead, the difference is that the state court has now clarified what it had ordered on June 18—which candidly was not how the State understood it. The State understood the June 18 Order's command that Appellant "respond fully" to the Subpoena to require full production. Thus, the State forthrightly told this Court and the federal district court that the case was ripe. But the state court explained in the November 19 hearing that it has adopted *Appellant*'s contrary view of the June 18 Order—that it merely required Appellant to respond with *objections* rather than documents. *See* JA663 (state trial court "not faulting the State" for its interpretation, acknowledging requirement to "respond fully" was "not as clear as I should've made it" and emphasizing court would not "hold" misunderstanding "against the State"). Because

26

the state court has confirmed it had not yet decided to compel compliance with any disputed requests, and no sanctions loom, this dispute is still unripe.

2. Appellant's arguments to the contrary do not pass muster. ***First***, Appellant incorrectly reads this Court's July 9 mootness order as holding that Appellant's claims were already ripe. FC.Br.21–22. Rather, this Court held that the first appeal was moot because "it is now undisputed" between the parties that the claims in the district court were ripe based on the state court's ruling as it was then understood. *See* CA3.Dkt.56-1 at 1–2. This Court did not hold Appellant's claims were ripe—it simply remanded the appeal in light of the state court's intervening June 18 Order. It is not unusual for this Court to dismiss an appeal as moot while "express[ing] no opinion on whether the case itself is moot." *Sczesny v. Murphy*, No. 22-2230, 2023 WL 4402426, at *1 (3d Cir. June 14, 2023). Moreover, even if this Court read the state court's June 18 Order the same way the State did, the state court's clarification would require this Court to revisit this jurisdictional ripeness question anew.

***Second***, Appellant currently faces no harm for not complying with the Subpoena, contrary to its unsupported statements about the threat of sanctions. *See* FC.Br.23. The power to impose penalties lies with the state court: New Jersey statutes require the Attorney General to apply to the state court for an order enforcing the Subpoena, and that court has discretion on whether to grant relief. *See* N.J. Stat. Ann. § 56:8-6 (CFA) (providing upon failure to "obey any subpoena," the Attorney

General "may apply to the Superior Court and obtain an order … [g]ranting such other relief as may be required"); N.J. Stat. Ann. § 45:17A-33(g) (CRIA) (similar); N.J. Stat. Ann. § 45:1-19 (P&O Law) (similar). Here, the state court explicitly stated Appellant faces no threat of sanctions because it is under no obligation to produce documents. *See* JA666, 659 ("I'm not granting sanctions on this motion.").

**Third**, even if Appellant could overcome *Reisman*, Appellant nonetheless fails to demonstrate Article III injury because it fails to show that the Subpoena has a chilling effect on its free expression. *See Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 220 (3d Cir. 2023). Courts are hesitant to find that service of a non-self-executing subpoena alone "chills" speech to create a justiciable claim. *See Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 57–58 (9th Cir. 2024) (recipient of attorney general's request for documents lacked injury-in-fact despite assertion of chilling effect on religious exercise because request "carries no stick");[3] *Twitter v. Paxton*, 56 F.4th 1170, 1172 (9th Cir. 2022).

While Appellant cites *Twitter*, FC.Br.24, which declined to apply *Reisman* to a First Amendment subpoena challenge and expressly diverged from *Google*, that

---

[3] *Seattle Pacific University* also found that the university had standing to bring pre-enforcement claims against an impending enforcement action under the Washington Law Against Discrimination, which were distinct from the claims challenging the request for documents alone. 104 F.4th at 59–61. By contrast, Appellant has confirmed that its lawsuit concerns the Subpoena only, "not some later, unfiled substantive lawsuit" for enforcement of state law. FC.Br.26; *see* JA88.

case does not help Appellant because *Twitter* still found the challenge premature. 56 F.4th at 1175. *Twitter* rejected a subpoena recipient's "naked assertion that its speech has been chilled" as conclusory and insufficient to demonstrate Article III injury. *Id.* That makes sense; the Supreme Court has made clear that the "mere existence" of an investigation does not alone "produce[] a constitutionally impermissible chilling effect" that warrants review. *Laird v. Tatum*, 408 U.S. 1, 10–14 (1972); *see also, e.g.*, *UMDNJ v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003) ("Courts should hesitate to scrutinize decisions to initiate administrative audits and investigations …."). Other courts have similarly dismissed challenges to investigative subpoenas as unripe where claims of "chill" were not supported with facts. *See, e.g.*, *CBA Pharma, Inc. v. Perry*, 2023 WL 129240, at *4 (6th Cir. Jan. 9, 2023) (describing allegation that "investigation will harass and intimidate shareholders" as "speculative"); *U.S. News & World Reports v. Chiu*, 2024 WL 2031635, at *13 (N.D. Cal. May 7, 2024) (plaintiff failed to demonstrate that "it has changed, or will change, its behavior to adjust to the [subpoenas]"); *Second Amendment Found. v. Ferguson*, 2024 WL 97349, at *4 (W.D. Wash. Jan. 9, 2024).

Here, Appellant similarly fails to establish "chill" sufficient to demonstrate a concrete injury. Appellant makes a series of unsupported assertions (1) that it lacks the resources to respond to the Subpoena without threatening "its mission-driven activities" and (2) disclosure of its employees, donors, and affiliated organizations

will cause those entities to cease their relationships with Appellant and deter others. *See* JA73–74, ¶¶ 71–79.[4] These speculative allegations boil down to the untenable notion that "*any* investigation into" its "practices creates a First Amendment injury." *Seattle Pac. Univ.*, 104 F.4th at 58. And Appellant fails to offer any evidence of alleged financial strain it will face by complying with the Subpoena or that such compliance will actually harm its mission. *Cf. Second Amendment Found.*, 2024 WL 97349, at \*4 (finding similar allegation was not "an allegation of actual, chilled speech"). Nor has Appellant pointed to any evidence that *any* person or organization would definitively cease its relationship with Appellant as a result of the Subpoena. *Cf. CBA Pharma., Inc.*, 2023 WL 129240, at \*4 (rejecting as impermissibly speculative the plaintiff's claim that the investigation would harm relationship with investors where "no allegations suggest that any investors contacted by [the State] pulled their investments, threatened to pull their investments, or reconsidered the investment relationship"). Because Appellant has not shown an actually impending injury based on the Subpoena alone, its claims are unripe.

---

[4] Nothing requires that the investigation be prompted by an underlying consumer complaint. State law vests the Attorney General with discretion to initiate an investigation if he "believes it to be in the public interest that an investigation should be made to ascertain" the existence of an unlawful practice. *See* N.J. Stat. Ann. § 56:8-3 (CFA); *see also* § 45:1-18 (P&O Law); § 45:17A-33(c) (CRIA); *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 216 (1946) (holding that the validity of a decision to investigate is not "limited by forecasts of the probable result of the investigation" (cleaned up)).

## II.    APPELLANT IS UNLIKELY TO SUCCEED ON THE MERITS.

Even if this Court reaches the merits of this preliminary injunction motion, Appellant's First Amendment claims are unlikely to succeed. This case concerns an investigation alone, where the State served its Subpoena but has not decided if it will pursue any civil or administrative action against Appellant for violations of the CFA, the CRIA, or P&O Law. That means Appellant bears a particularly high burden: typically, a public agency "violates no constitutional rights by merely investigating" conduct to determine whether its laws were violated. *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 628 (1986); *see SEC v. McGoff*, 647 F.2d 185, 187–88 (D.C. Cir. 1981) (holding that investigative subpoenas themselves "do not directly regulate the content, time, place, or manner of expression" for First Amendment purposes). Appellant tries to evade that rule by claiming this Subpoena reflects animus against it, and that a subset of the Subpoena's requests unlawfully burden associational rights. Both claims will fall short.

### A. Appellant Is Not Likely To Succeed On Its Retaliation, Selective Enforcement, Or Viewpoint Discrimination Claims.

Appellant's retaliatory / selective enforcement and viewpoint discrimination theory, JA74–76, fails for two principal reasons: the State had sufficient cause to justify its Subpoena, and the claims of improper motive are speculative and unsupported.

1. Initially, Appellant cannot show the State lacked sufficient cause for its Subpoena. Precedent confirms that when an individual or entity challenges the State's enforcement action as retaliatory, the challenger must show not only "retaliatory animus," but also that the action would not "have been [taken] anyway, independently of any retaliatory animus." *Hartman*, 547 U.S. at 259–61, 265–66 (in criminal cases, "establishing the existence of probable cause will suggest that prosecution would have occurred even without a retaliatory motive"); *see Nieves v. Bartlett*, 587 U.S. 391, 404 (2019) (explaining that "[a]bsent … a showing [of a lack of probable cause], a retaliatory arrest claim fails" regardless of the number of government actors in the causal chain). This burden is required since there is a "presumption that a prosecutor has legitimate grounds for the action he takes," *Hartman*, 547 U.S. at 263, and thus a plaintiff must have "clear evidence' displacing the presumption that a prosecutor has acted lawfully," *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999).

That principle applies to civil enforcement actions. *See DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1304–09 (11th Cir. 2019) ("[A]s with § 1983 First Amendment retaliation claims arising in the criminal prosecution and arrest context, the presence of probable cause will generally defeat a § 1983 First Amendment retaliation claim based on a civil lawsuit as a matter of law."); *Scott v. Tempelmeyer*, 867 F.3d 1067, 1070–72 (8th Cir. 2017) (applying *Hartman*'s no-probable-cause

requirement to case involving local building code, citing similar circuit precedents); *McBeth v. Himes*, 598 F.3d 708, 720 (10th Cir. 2010) (civil licensure suspension); *see also Meadows v. Enyeart*, 627 F. App'x 496, 505 (6th Cir. 2015) (health department proceedings); *see also DeMartini*, 942 F.3d at 1298–99 (discussing pre-*Hartman* precedents examining "whether the underlying civil action was frivolous" in valuating retaliation claims). That is, in the civil litigation context as much as in "retaliatory criminal prosecution cases," the absence of legally sufficient cause is "necessary to bridge the gap between the defendant's alleged animus and plaintiff's injury." *DeMartini*, 942 F.3d at 1304.

That rule makes sense. For one, as *DeMartini* explained, a government-initiated civil proceeding is the fruit of some investigation and information-gathering, a legal recommendation by counsel, and a decision by the relevant officials to further investigate or file an enforcement action. *Id.* at 1304. That "widen[s] the causal gap" between "any … retaliatory animus" a government official is alleged to have and the actual government action taken. *Id*. Moreover, like in criminal prosecutions, government has a "legitimate interest and motivation in protecting" its "citizens" through civil litigation and investigations alike, "independent of any motivation to retaliate." *Id.* at 1305.

Thus, to prevail on its claims for retaliatory enforcement under Section 1983, Appellant must show that the State lacked proper cause for the Subpoena. Appellant

cannot do so.[5] In general, good cause to investigate is a low bar. *See, e.g., UMDNJ*, 347 F.3d at 64 ("[A]n agency ordinarily 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" (citation omitted)). Here, the concrete bases for the Division's investigation included the presence of divergent statements regarding Appellant's operations across different websites, potentially misleading or untrue medical statements, and potential misrepresentations regarding the role that licensed professionals play. *See supra* at 6-11.

The Subpoena Requests enable the State to investigate those potential legal violations—or obtain assurance that these laws are not being violated. To take a few examples, Requests 6(b-c), 6(e-f), 6(j-m), 7(d) and 8 ask for information to substantiate Appellant's claims about the risks of the abortion pill, and are relevant to whether Appellant's factual statements on the subject are well-grounded or lack support. JA133–35. Similarly, Requests 6(w-cc) and 8 ask for information to substantiate Appellant's claims regarding the safety and efficacy of abortion pill reversal. *Id.* Requests 14 and 15 seek the identities of those providing medical

---

[5] Appellant agrees its claims for retaliatory and selective enforcement and viewpoint discrimination rise and fall together. FC.Br.46 ("The same facts that establish retaliation also show that the Attorney General has selectively enforced the law based on viewpoint."). Given that the investigation was based on good cause rather than "an 'unjustifiable standard,'" *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (citation omitted), Appellant's trio of First Amendment theories all fail.

services on behalf of Appellant, and if licensure is required for services provided to clients, to assess whether individuals are providing unlicensed care, or whether medical professionals have been involved in misleading medical statements. JA136. Request 26 would enable the Division to contact a representative sample of donors and ensure they have not been misled by representations they encountered on https://1stchoice.org and https://firstchoicewomancenter.com, which contain differing representations regarding Appellant's mission and services than https://1stchoicefriends.org. JA137. Finally, Request 5 would enable the Division to assess the accuracy of Appellant's representations to clients about the confidentiality of client records. JA133.

The Subpoena followed an investigation by career Division investigators; the Division ultimately issued these November 15, 2023 demands; and counsel from across the Department of Law and Public Safety participated in the suit enforcing the Subpoena, further confirming the sufficient basis underlying the Subpoena. *See supra* at 6–10. *See Tempelmeyer*, 867 F.3d at 1071 (noting causal gap between animus allegation and alleged retaliation exists even where the action was carried out by subordinates of the official allegedly driven by improper motive).

Rather than grapple with the relevant standard in *Hartman*, Appellant cites *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). But *Lauren W.* is inapposite: it did not involve a State's efforts to protect its residents via

regulatory enforcement or investigation, *see DeMartini*, 942 F.3d at 1304, but rather, alleged retaliation by a school district against a student—by "refusing to release tuition reimbursement money"—for exercising certain statutory educational rights, *Lauren W.*, 480 F.3d at 266–67. But as numerous precedents explain, a claim of retaliatory investigation or prosecution, civil or criminal, is best viewed through *Hartman*'s standard. *See, e.g.*, *DeMartini*, 942 F.3d at 1289–1300; *Tempelmeyer*, 867 F.3d at 1070–72. Appellant cannot satisfy that standard.

2. Even assuming Appellant could clear that dispositive bar, it nonetheless fails to establish this Subpoena was driven by improper motive.[6] Notwithstanding the considerable bases for this investigation, Appellant asserts that the Attorney General and Division were motivated by animus by citing to (1) the Attorney General's public statements and meetings on reproductive healthcare, (2) a prior consumer alert and open letter, and (3) the failure to subpoena Planned Parenthood. FC.Br.8–10. But none show that the Subpoena was issued based on an "unjustifiable standard" or that similarly situated comparators were not investigated. *Hill*, 411 F.3d

---

[6] "[I]f the plaintiff establishes the absence of probable cause, 'then the *Mt. Healthy* test governs: The plaintiff must show that the retaliation was a substantial or motivating factor behind the [Subpoena], and, if that showing is made, the defendant can prevail only by showing that the [Subpoena] would have been initiated without respect to retaliation.'" *Nieves*, 587 U.S. at 404 (citation omitted).

at 125. That dooms Appellant's retaliation, selective enforcement, and viewpoint discrimination claims.

As a threshold matter, far from singling out Appellant, the Division regularly investigates entities across a variety of industries and fields when there is concern about potential violations of the CFA, the CRIA, or the P&O Law, including by issuing a subpoena. For example, the State has investigated numerous entities based on complaints of alleged unlicensed practice of medicine (including utilization of ultrasound, radiofrequency, and cavitation machines), fraudulent advertising, and failure of a licensed physician to be present at the time of the healthcare services. *See* SA335–85. And it has filed complaints and administrative actions against charities for making untruthful oral or written statements, including misrepresenting the purpose or nature of the charitable institution or the purpose or beneficiary of a solicitation, soliciting contributions for any purpose other than the charitable purpose expressed in the statement of the charitable organization, and/or expending contributions in a manner inconsistent with that purpose. *See* SA128–299, 387–453.

Although Appellant says that the Attorney General's statements on reproductive care generally means this investigation must be borne of animus, courts have repeatedly rejected this kind of attack. In *Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679 (S.D.N.Y. 2018), a court rebuffed Exxon's nearly identical attempt to evade compliance with two subpoenas issued by two state attorneys

general on the grounds that the real purpose of their fraud investigations was to punish and deter its views on climate change. *See id.* at 686–87. Exxon cited statements by the officials about climate change and claimed outside activists influenced the subpoena decisions. *Id.* at 706–07. The court rejected those arguments, holding Exxon had not shown the States were "pursuing an investigation even though [they] do[] not believe that Exxon may have committed fraud"—the high bar Exxon needed to meet. *Id.* at 707, 712. The court emphasized a lack of "direct evidence" of improper motive, and held the "circumstantial" evidence—the statements on climate change—did not show this investigation was retaliatory. *See id.* at 707 ("The fact [an official] believes climate change is real ... does not mean the [official] does not also have reason to believe that Exxon may have committed fraud."). Nor did meetings with environmental activists fill the gap: such "circumstantial evidence … fails to tie the AGs to any improper motive, if it exists, harbored by activists." *Id.* at 712.

As the state court already recognized in this case, Appellant's claim is at least as speculative. *See* JA257 (rejecting Appellant's position that the Subpoena resulted from "retaliation and bias on the State's part" because its claim was "speculation"). As in *Exxon*, there is no "direct" evidence that animus motivated this Subpoena— nothing Appellant identifies demonstrates that he and the Division did not also believe Appellant may be engaging in fraud or misconduct. None of the statements

mention Appellant. Moreover, "public officials, including the Attorney General, frequently make statements of public concern." JA257. Were that enough to foreclose investigations into entities who operate in those industries, it would put the officials "in a straight-jacket relative to their public comments" and could mean "a pharmaceutical company that sells opiate-based pain killers" has the right to "enjoin an investigation of it if the prosecutor stated publicly that the public should have accurate information about the risks of opiate use." *Exxon*, 316 F. Supp. 3d at 710 n.29; *see also SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 130 (3d Cir. 1981). The Attorney General's support for access to reproductive care, consistent with New Jersey state law, *see* N.J. Stat. Ann. §§ 10:7-1 to -2 (Freedom of Reproductive Choice Act), and his meetings with advocacy organizations and healthcare providers who broadly share that view, do not show improper motive.

Nor are Appellant's specific arguments about the Attorney General's public statements more persuasive. *See* FC.Br.8–10, 40–41 (citing JA289–90 (Consumer Alert)); Open Letter from Attorneys General Regarding CPC Misinformation and Harm, Calif. Off. of the Att'y Gen. (Oct. 23, 2023), http://bit.ly/3CtAShf. Far from showing that the Attorney General harbors some improper purpose for his fraud investigation, these materials confirm that concerns about potentially fraudulent and deceptive practices motivated the issuance of this Subpoena. For example, the Consumer Alert informs the public that organizations like Appellant may engage in

potential deceptive tactics including (1) using names and signage with pro-choice connotations, (2) offering free ultrasounds, pregnancy tests, and supplies targeted at specific populations, (3) offering pregnancy counseling that does not include complete or accurate information regarding abortion, (4) postponing care to delay access to abortion, and (5) providing false or misleading information about the safety and legality of abortion. JA289. These same concerns—combined with others from the State's preliminary investigation into Appellant's practices—animate the Subpoena. That the State used informational alerts to combat potential fraud hardly undermines its efforts to investigate potential fraud.

Appellant gets no further by suggesting that the State is treating Appellant differently than other entities—in particular, Planned Parenthood. To prevail on this argument, Appellant must establish that the State is not treating "similarly situated" entities alike, *Hill*, 411 F.3d at 125, and that the party which avoided investigation is "alike 'in all relevant respects,'" *Children's Health Def., Inc. v. Rutgers*, 93 F.4th 66, 84 (3d Cir. 2024). "'[B]road generalities' are insufficient." *Stradford v. Sec'y Pa. Dep't of Corr.*, 53 F.4th 67, 74 (3d Cir. 2022). Appellant cannot meet this standard.

The basis of this investigation is not whether an entity serves those considering abortions, *see* FC.Br.43; rather, it is whether an entity is providing false or misleading statements to potential donors and clients. On that front, Appellant's

briefing fails to identify any misrepresentations by Planned Parenthood remotely similar to the alleged misrepresentations the State was concerned with here. Appellant argues that Planned Parenthood maintains separate websites for its medical services and political PAC, FC.Br.44–46, but the mere fact of multiple websites is not the concern—it is the divergent representations Appellant makes across those websites as to its mission and operations. *See supra* at 6–8. By contrast, the Planned Parenthood websites Appellant references all state the organization's mission and services—eliminating any risk that any donor or client was misled. *See* FC.Br.45. Moreover, as to medical information, Appellant's sole assertion that Planned Parenthood makes misleading statements about the safety of abortion medication, FC.Br.43, lacks support in this record—a sharp contrast to the specific concerns the State identified above regarding Appellant's representations. *See supra* at 8 (comparing statements to FDA label and medical association's website). Additional differences abound: Planned Parenthood is registered as an ambulatory care center with the N.J. Department of Health, N.J. Admin. Code § 8:43A-1.3, while Appellant is not; Planned Parenthood must comply with laws such as HIPAA, while Appellant says it is exempt. *See* N.J. Dep't of Health, Hospitals, Ambulatory Care, and other Acute Care Facilities, https://tinyurl.com/yaye3a7n (search by Name of Facility for "Planned Parenthood") (last visited Dec. 2, 2024); Planned

Parenthood Notice of Health Information Privacy Practice, https://tinyurl.com/3mrx6a9s (last visited Dec. 2, 2024). Appellant's attack cannot withstand scrutiny.

Finally, *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024), is not to the contrary. *Vullo* involved allegations that a public official had coerced regulated entities to cease doing business with the NRA in order to suppress the organization's advocacy. *Id.* at 180–81. *Vullo* did "not break new ground" but only "reaffirm[ed] the general principle" that "a government official cannot do indirectly what she is barred from doing directly." *Id.* at 190, 197. That has no bearing here, because the Subpoena is not a direct nor indirect means of advancing unlawful goals. Rather than "convey[ing] a threat of adverse government action" to punish speech, *id.* at 191, the Subpoena is a standard way to investigate violations of consumer-protection, charities, and professional occupations laws. Appellant's claims that the investigation lacks basis or is borne of improper motive are unlikely to succeed.

### B. Appellant Is Not Likely To Succeed On Its Association Claim.

Appellant's associational claims also fall short. To start, Appellant's argument applies only to the Subpoena's Requests for the identities of its donors, medical staff, and affiliates—and so, even if likely to prevail, would support a preliminary injunction against the enforcement of those Requests alone. That said, the entire claim founders, as it misunderstands both the law and the record.

The standard governing an associational challenge to a disclosure requirement is exacting scrutiny, which requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *AFP*, 594 U.S. at 607 (citations omitted). In the context of a challenge to a broad state law requiring disclosure of donors, the Supreme Court held that exacting scrutiny also "requires that a government-mandated disclosure regime be narrowly tailored to the government's asserted interest," although it need not be "the least restrictive means of achieving that end." *Id.* at 597. Under this "less intense standard," exacting scrutiny "require[s] a fit that is not necessarily perfect, but reasonable." *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021) (upholding state election donor disclosure requirement under *AFP* standard). While Appellant suggests in passing that strict scrutiny might apply, FC.Br.30, the *AFP* Court expressly rejected the invitation to apply that standard to associational challenges, holding instead that "exacting scrutiny *does not*" incorporate strict scrutiny's least-restrictive means requirement. *AFP*, 594 U.S. at 608. Regardless, under any standard, the challenged requests—for donor identities, medical personnel, and communications with specific national groups—survive.

**First**, the Subpoena's sole Request for donor information, JA137 (Request 26), is constitutional because it is tailored to the State's powerful anti-fraud interest. It is undisputed that States have compelling interests in investigating and combatting

fraud on donors. *See Ill. ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 623–24 (2003) (recognizing the Supreme Court has "repeatedly recognized the legitimacy of government efforts to enable donors to make informed choices about their charitable contributions"); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988) ("[T]he State may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements"); *see also AFP*, 594 U.S. at 612 (same). Although courts have held that certain *prophylactic* laws requiring charities to disclose their donors on a blanket basis may be insufficiently tailored, the Supreme Court confirmed that a more targeted measure to investigate donor fraud is permissible, citing a reasonably supported "subpoena or audit letter" as the canonical example. *AFP*, 594 U.S. at 613–14; *Madigan*, 538 U.S. at 617 (finding "critical" distinction "between fraud actions trained on representations made in individual cases and statutes that categorically ban solicitations when fundraising costs run high"); *Riley*, 487 U.S. at 795 (expecting rigorous enforcement of state "antifraud law").

The donor information that Request 26 seeks reflects a tailored response to the State's well-supported concerns of potential fraud and misrepresentations. As noted above, the State's initial investigation revealed that Appellant may have misled donors through inconsistent representations across multiple websites—with sharply different information about its mission and operations, one of which states

44

as its mission to "protect the unborn," and the others of which say that Appellant invites women "considering an abortion" to "learn more about the abortion pill, abortion procedures, and your options in New Jersey." *Supra* at 6–7. Indeed, as counsel explained at the November 19 state-court hearing, the Division is currently only seeking enforcement of that Request as to the identities of donors who had contributed through the two Client Sites, https://1stchoice.org and https://firstchoicewomancenter.com, *not* as to those donors who contributed in other ways—such as, at galas and church fundraisers. *See* JA632–33. Although the Division is seeking information as to the other *methods* of solicitation and donation, so that it can assess whether misrepresentations were made there too, the only names of donors Appellant need provide relate to those two websites.

The State's request is well-grounded: it seeks information regarding the donors most likely to have been misled, so the Division can contact a representative sample and determine what they did or did not know about their charitable giving. Indeed, Appellant does not identify any other way that the State could learn this information. Moreover, Appellant's suggestion that the State seeks information on donors who made contributions at "benefit dinners" or "church … campaigns," FC.Br.12, conspicuously omits the State's confirmation at the November 19 hearing that it was *not* currently seeking the names of donors who contributed in that way. *See* JA632–33. While the Division will continue to evaluate whether other avenues

of donation are susceptible to misrepresentation, the scope of the current Request is narrow and carefully tailored to the concern about misrepresentations on Appellant's diverging websites.[7]

The fact that the Division also "can[not] obtain … the information [it] seek[s] from other sources," *Perry v. Schwarzenegger*, 591 F.3d 1147, 1164 (9th Cir. 2010), further supports the constitutionality of its request. The Division cannot otherwise contact donors who contributed via these websites to evaluate whether they were misled. Appellant replies that the Division should be satisfied instead by the mailer it purportedly sends to every donor—which Appellant only turned over in response to the Subpoena—that states its pro-life mission. FC.Br.33-34.[8] But the central inquiry under the CFA and the CRIA focuses on the representations in Appellant's solicitations—not what Appellant might communicate after donations are made. And even if the Court were to consider this post-donation mailer, Appellant's theory

---

[7] Although Appellant claims the State seeks identities behind 5,000 donations, it has never divulged how many donors gave via donation links on https://1stchoice.org and https://firstchoicewomancenter.com.

[8] Similarly, Appellant's claim that "every page of the client website states that First Choice does not provide or refer for abortions," FC.Br.31, hardly counters the concern. The statement does not reveal Appellant's pro-life mission, especially when viewed in context. *See supra at* 6-7. The statement also does not appear on the donation page for the Client Site, *see* JA698-701; https://tinyurl.com/5fu43b8h (last visited Dec. 2, 2024), and instead can only be found in the fine print at the bottom of the webpage, which Appellant cannot plausibly claim is read by most visitors. JA676-81.

is pure speculation: it assumes individuals who make their charitable giving online are actually opening and reading such mailings. In any event, all of this may bear on whether the Division ultimately files an enforcement action, and what defenses are available to Appellant should the Division do so. But these alleged defenses do not obviate the Division's underlying need to *investigate* whether Appellant made representations capable of misleading donors.

**Second**, Appellant's objection to the four Subpoena Requests relating to its medical personnel's licensure, qualifications, work and referrals has two independent flaws. *See* JA136 (Requests 14-16, 18). Initially, it is not evident that associational rights attach in this context. Appellant cites no case law for this proposition, and *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958) implies a result to the contrary. There, while applying associational rights to disclosure of members of the NAACP to the state, the Supreme Court noted there was no corresponding "object[ion] to divulging the identity of [NAACP's] members who are employed by or hold official positions with it," which "would not on this record appear subject to constitutional challenge and have been furnished." 357 U.S. at 463-65. And while the *NAACP* Court could not "perceive" on the record before it that disclosure of the member list would "substantial[ly] bear" on the purpose of the state's investigation, *id.* at 464, that is not the case here, where the Division's

Requests related to Appellant's professional licensees and staff providing services to clients directly bear upon the issue of compliance with the P&O Law.

Moreover, the record lacks any evidence (or even allegation) sufficient to establish a "reasonable probability that the compelled disclosure … will subject [medical personnel or affiliates] to threats, harassment, or reprisals." *Gaspee Project*, 13 F.4th at 92. The declarations that Appellant provides regarding its *donors* fail to demonstrate a burden on its associational rights related to disclosure of *medical personnel and affiliates*. Appellant has not established the Subpoena's Requests for identities of medical personnel is "more than a 'modest burden'" on associational rights. *No on E v. Chiu*, 85 F.4th 493, 508 (9th Cir. 2023) (citation omitted).

In any event, even assuming a burden on associational rights, the Subpoena's request for information about medical personnel and staff are again narrowly tailored to the compelling State interest in investigating potential unlicensed practice of medicine and conformance to the applicable standards of care. *See* N.J. Stat. Ann. § 45:1-18.1. The State's initial investigation raised serious concerns on these fronts. Appellant's websites represent that it has medical personnel onsite to provide services. *See* JA673, 790 (promising to "serve[] women and men in unplanned pregnancies, by providing counseling, medical services, and practical support.") The Client Site invites potential clients to contact Appellant to consult with "a licensed

medical professional," and states its "medical staff can answer all of [a client's] questions … with professional accuracy." JA747; *see also* JA903 ("Our trained client consultants and in-house medical professionals are ready to assist you."); JA898 ("We are … dedicated to the highest standard of medical care…."). Its websites are laden with imagery of medical personnel in advertisements for ultrasound services. *See, e.g.*, JA676, 679, 728, 731 (images of individuals wearing scrubs, stethoscopes, and lab coats).

The personnel information the Subpoena seeks reflects a tailored response to the State's legitimate concerns. The Subpoena is an effort to identify the participation of licensed professionals and individuals without proper licensure— and to determine whether these personnel are complying with applicable state standards in providing medical services. The State's investigation revealed that Appellant informs potential clients that it has a doctor that "oversees" the facility and even admits that it does not have doctors onsite, even while Appellant apparently offers a range of medical services. JA673. For example, Appellant represents that its sonographers—not medical doctors—conduct ultrasounds to determine gestational age, viability, and ectopic pregnancies. JA903. Appellant also represents that it provides counseling services related to abortion, pregnancy, and STI testing services. *See, e.g.*, JA059, 060, 908, 930. And Appellant provides pamphlets and videos about the purported risks of abortion, if the clients first submit to a pregnancy

49

test. JA678, 680, 682. Although Appellant claims the Division should be satisfied instead with receiving general information about the nature of the services it provides, that information gives the State no assurance that all those providing medical services for Appellant are appropriately licensed and complying with applicable standards.

*Finally*, Appellant errs in challenging the Subpoena's two Requests for information about its relationship with national affiliate organizations—Heartbeat International (HBI) and Care Net. *See* FC.Br.38; JA136 (Requests 22-23). Again, this challenge fails at the outset because it fails to explain how this request implicates or harms associational rights. *See supra* at 46-47. More fundamentally, these Requests are narrowly tailored to the State's interest in rooting out potential fraud. For one, the State seeks to assess whether Appellant used materials or made referrals related to HBI's Abortion Pill Rescue Network, *see* https://tinyurl.com/5yurhpn7 (last visited Dec. 2, 2024), which facilitates abortion pill reversal, an experimental procedure that lacks scientific basis, does not meet clinical standards, and is not FDA-approved, *see* Am. Coll. of Obstetricians & Gynecologists, *supra*. For another, given that Appellant's privacy policy indicates it shares client information with affiliates, the requested information would enable the State to assess whether information shared with HBI or Care Net includes protected client information. And finally, in light of public reporting that these national organizations specifically

"encourage[] affiliates to create two websites, one that describes the anti-abortion mission to secure donors, and one designed for people seeking medical care," Jenifer McKenna & Tara Murtha, *Designed to Deceive: A Study of the Crisis Pregnancy Ctr. Industry in Nine States* at 7, 33-34 (2021), https://tinyurl.com/5xcpzpyr, information regarding Appellant's coordination with these organizations can inform the investigation of the divergent representations across Appellant's websites—and whether enforcement under the CFA, CRIA, or P&O Law is warranted.[9]

## III.  THE EQUITIES FORECLOSE A PRELIMINARY INJUNCTION.

Appellant's request for a preliminary injunction should also be denied because it cannot demonstrate irreparable harm, nor can it establish that the remaining equitable factors weigh in its favor. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (irreparable harm is a "gateway factor" for emergency relief); *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (discussing traditional four-part test and appellate standard of review).

1.     Appellant's theory of irreparable harm hinges on the incorrect premise that it will face legal sanctions for noncompliance with the Subpoena. FC.Br.22–24. But because the state trial court confirmed that she was not awarding any sanctions for their nonproduction to date, *see* JA659, there is simply no irreparable harm, *see*

---

[9] Finally, even if Appellant were entitled to injunctive relief on its associational claims, that relief would apply only to the relevant Requests, not the entire Subpoena.

*supra* at 29–30. And although this Court will "presume that First Amendment harms are irreparable" since "suppressing speech or worship inflicts irreparable injury," *Del. State Sportsmen's Ass'n v. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 204 (3d Cir. 2024), the State is not suppressing or enjoining speech—it is just *investigating* fraud and requesting documents. *See Ohio Civil Rights Comm'n*, 477 U.S. at 628 (agency "violates no constitutional rights by merely investigating"). Appellant faces no "Hobson's Choice" between production or sanctions.

Indeed, Appellant's claim that it is facing irreparable harm from the Subpoena is impossible to square with its own delays in this case. *See DSSA*, 108 F.4th at 206 ("Delay in seeking enforcement of [litigant's] rights, however, tends to indicate at least a reduced need for such drastic, speedy action."). For one, Appellant "ch[ose] not to hasten" its efforts to seek relief in the state courts. *Id.* at 206. It declined to pursue a stay pending appeal from the Appellate Division, despite representing to the state trial court that it would do so. *See* JA260–61 (counsel stating that Appellant would like to appeal and "apply for a stay"); JA269–70 (court indicating it would immediately enter order denying stay pending appeal so that Appellant could seek further relief). Nor has Appellant acted with alacrity in federal court. When this case was last before this Court, Appellant only belatedly sought to expedite the appeal. *See* CA3.Dkt.29. And even after the state court issued its May 28 oral ruling, Appellant waited 18 days before renewing its efforts for an injunction in this Court—

and then engaged in weeks-long motions practice when the State agreed to remand the case for the district court to consider a TRO/PI motion in the first instance. *Supra* at 16–17. If the Subpoena was working an irreparable harm on Appellant's speech each day it remained in effect, Appellant's litigation choices are hard to explain.

Nor does Appellant's explicit concern that it will have to produce additional documents before a *federal* court has reviewed its challenges constitute irreparable harm sufficient for an injunction. *See* FC.Br.1. Case law is clear that having to litigate one's federal constitutional arguments in state court rather than federal court is no irreparable harm at all. *See*, *e.g.*, *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) (agreeing that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury"); *see Coinbase, Inc. v. Bielski*, 599 U.S. 736, 746–47 (2023) (same); *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990) (adding that "state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States."); *Mo. Pac. Ry. Co. v. Fitzgerald*, 160 U.S. 556, 583 (1896) (same); *cf. In re Diet Drugs*, 282 F.3d 220, 234 (3d Cir. 2002) (concurrent state and federal litigation, in which "[e]ach court is free to proceed in its own way and in its own time, without reference to the proceedings in the other court," is legally permissible). The state trial court expressly promised to review the briefing on the constitutional challenges before requiring Appellant to produce documents, and it is as of yet uncertain how that

court will adjudicate them. The only harm that Appellant faces is that it may not prevail in litigation, the same risk every litigant faces—not an injury meriting extraordinary injunctive relief.

2.      The remaining equities militate against issuing preliminary relief. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (when the State is a defendant, the other factors—harm to opposing party and public interest—combine). Unlike Appellant, the State would face irreparable harm were a preliminary injunction entered against it. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (noting that the "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State."). At least three different state laws afford the Attorney General power to investigate potential misconduct in this matter. *See* N.J. Stat. Ann. §§ 56:8-4, -6(d) (CFA), 45:17A-33(g) (CRIA), 45:1-18 (P&O Law). Each empowers the Attorney General to issue subpoenas in service of investigations. And each provides that the Attorney General's remedy for non-compliance—seeking an order requiring the production of documents—lies in the state court, where the parties already are actively litigating the scope of the trial court's enforcement order.

A preliminary injunction would also allow Appellant to continue to delay the investigation. Despite the long-surpassed Subpoena return date of December 2023, Appellant has yet to fully comply. A federal injunction at this late date would potentially forestall compliance into 2025. The State would suffer harm if its

ongoing investigative work is stymied for such an extended period. *See Interstate Commerce Comm'n v. Gould*, 629 F.2d 847, 851–52 (3d Cir. 1980) (agencies "must be free without undue interference or delay to conduct an investigation which will adequately develop a factual basis for a determination as to whether particular activities come within the [agency's] regulatory authority"). And granting an injunction would incentivize subpoena recipients to file collateral challenges to avoid compliance and stymie state-court enforcement, further compromising future state investigations. Thus, the equities counsel against a preliminary injunction.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:   s/Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: December 2, 2024

## COMBINED CERTIFICATIONS

I hereby certify that the following statements are true:

1.  I am an attorney in good standing of the bar of the Third Circuit.

2.  This brief complies with the typeface, type style and type-volume limitation requirements of Fed. R. App. P. 32 because this brief has been prepared in a monospaced typeface using Microsoft Word, in Times New Roman, 14-point, type style, and contains 12,940, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

3.  The text of the paper copies of this brief and the text of the PDF version of this brief filed electronically with the Court today are identical.

4.  Prior to electronically filing this brief with the Court today, it was scanned by Crowdstrike Falcon, version 7.17.18721.0, a virus detection software, and found to be free from computer viruses.

5.  On December 2, 2024, this brief was filed electronically with the Clerk of the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

Dated: December 2, 2024
s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General